# Third District Court of Appeal

## State of Florida

Opinion filed April 3, 2024.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D22-1290
Lower Tribunal No. 20-13123
_____

**Seneca Specialty Insurance Company,**
Appellant,

vs.

**Jade Beach Condominium Association, Inc., etc., et al.,**
Appellees.

An Appeal from the Circuit Court for Miami-Dade County, David C. Miller, Judge.

Kennedys CMK LLP, and Josh Levy, Martin F. Harms, and Jedidiah Vander Klok, for appellant.

Boyle, Leonard, & Anderson, P.A., and Alexander Brockmeyer (Fort Myers), for appellees.

Before LOGUE, C.J., and SCALES and GORDO,[*] JJ.

LOGUE, C.J.

_____

[*] Judge Gordo did not participate in oral argument.

Seneca Specialty Insurance Company appeals the trial court's order dismissing its breach of contract action against Seneca's insured, Jade Beach Condominium Association, Inc. In the operative complaint, Seneca alleged the Association violated the policy provisions requiring the Association to refrain from impairing Seneca's subrogation rights when the Association settled with, and released, tortfeasors responsible for claims that had been brought by third parties against the Association, and which Seneca had paid on the Association's behalf. The narrow issue on appeal is whether Seneca sufficiently stated a breach of contract claim by alleging the Association's releases barred its subrogation rights and attaching the policy and releases. The trial court ruled that the complaint failed to state a claim because, in these circumstances, an insurer must allege it first sued the responsible tortfeasors and suffered a judgment finding that the insured's releases barred its subrogation rights. For the reasons stated below, we conclude that Seneca sufficiently pled its claim. Thus, we reverse the trial court's dismissal of Seneca's breach of contract claim.[1]

---

[1] We affirm the trial court's dismissal with prejudice of Seneca's remaining claims.

## BACKGROUND

Seneca issued a liability insurance policy to the Association that required the Association to refrain from impairing Seneca's subrogation rights against responsible tortfeasors. The policy stated:

> If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

On August 1, 2014, the owners of Unit 4701 at Jade Beach Condominium ("Unit 4701") sued the Association, the owner of Unit 4904 ("Unit 4904"), and two construction companies, among others. Unit 4701 alleged that water flowing down from Unit 4904's balcony and from limited common areas appurtenant to Unit 4904 caused damage to their balcony. Unit 4701 contended the Association had a non-delegable responsibility to maintain the structural and mechanical elements of the Unit 4904 balcony, which was a limited common element. Based on these allegations, Unit 4701 alleged claims against the Association for breach of the declaration of condominium, trespass, and nuisance.

Unit 4904 then filed a crossclaim against the Association and alleged claims for breach of the condominium's declaration, contribution, common law indemnification, and equitable subrogation ("Unit 4904's Crossclaim").

3

Unit 4904 argued the Association had a duty to maintain the condominium's common elements and to remedy any structural defects. As such, they contended, the Association had a duty to remedy the water run-off from Unit 4904's balcony and to remedy water intrusion into Unit 4904 because these issues arose from underlying structural issues with common and limited common elements.

When notified by the Association of the lawsuits, and as required by the policy, Seneca provided the Association with a defense and ultimately paid its liability policy limit of $1,000,000 on behalf of the Association to settle Unit 4904's Crossclaim.

Unbeknownst to Seneca, however, while these unit owner actions were pending, the Association filed a separate construction defect lawsuit against the condominium developer, general contractor, design professionals, and subcontractors, including the concrete formwork subcontractor, the mechanical subcontractor, and the caulking and waterproofing subcontractor (collectively, "the Construction Defect Defendants"). The Association's lawsuit (the "Construction Defect Lawsuit") included allegations of defects in mechanical rooms causing leakage into units below, defects in roofs, and defects in balcony slopes. In addition to damages, the Association sought indemnification from the Construction

Defect Defendants for all unit owner claims brought against the Association arising from the defects.

The Association resolved the Construction Defect Lawsuit through various settlements totaling approximately $12,565,000. The settlement amounts were not allocated to any particular claims. As part of the settlement, the Association gave the Construction Defect Defendants general releases of the Association's claims. For example, one of the releases provided:

> [T]he Association, for themselves and each of their respective . . . insurers hereby mutually release and forever discharge [the general contractor] and each of their respective . . . insurers, . . . and any person or entity that provided labor, materials or services under a direct contract with [the general contractor] related to the construction of the [condominium], from any and all manner of past, present and future claims, actions, causes and causes of action, suits, lawsuits, debts, dues, duties, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, liabilities, statutory claims for damages, exemplary and/or punitive damages, claims for indemnity or contribution, controversies, expenses, assessments, penalties, charges, injuries, losses, fees, costs, damages, expenses, agreements, promises, variances, trespasses, judgments, executions, and demands whatsoever, in law or in equity, which they ever had, now have, will have, or may have in the future, against each other, both known and unknown, latent and patent, asserted and unasserted, suspected and unsuspected, discovered and undiscovered, whether now existing, or hereafter arising, that relate to, arise

5

out of, or are in any way connected with, the original construction of the [condominium], including but not limited to all claims which were or could have been asserted in the [Construction Defect Lawsuit].

(emphasis added).

The Association allegedly did not inform Seneca of these settlements at any time before Seneca paid its liability policy limit to settle Unit 4904's Crossclaim, and Seneca was not a party to the Construction Defect Lawsuit or the settlement agreements.

On June 22, 2020, Seneca filed the underlying action against the Association. The operative complaint included a breach of contract claim against the Association, arguing the Association impaired Seneca's subrogation rights by releasing the Construction Defect Defendants in the Construction Defect Lawsuit. Attached to the complaint were copies of the Association's releases given to the Construction Defect Defendants. The complaint alleged the Association's releases barred Seneca's subrogation rights against the Construction Defect Defendants.

The Association moved to dismiss and argued that Seneca's breach of contract claim was premature because Seneca failed to first sue the Construction Defect Defendants and suffer a judgment that found Seneca's subrogation rights had been impaired by the Association. The Association also argued that dismissal was warranted because Seneca's liability

6

payment in Unit 4904's Crossclaim did not overlap with damage claims asserted in the Construction Defect Lawsuit. The Association contended it recovered for damages to the common elements, while Unit 4904's Crossclaim sought to recover different damages—damages to the interior of an individual unit, for which the Association did not have standing to sue.

In opposition, Seneca argued its breach of contract claim was not premature because it was not required to first file an unsuccessful subrogation action against the Construction Defect Defendants as a condition precedent to filing its breach of contract action against the Association. Seneca further maintained that, because there was overlap between the damages sought in Unit 4904's Crossclaim (for which Seneca, on behalf of the Association, paid its policy limits to settle) and the claims made by the Association in the Construction Defect Lawsuit (which resulted in the $12,565,000 settlement proceeds recovered by the Association), Seneca would have been subrogated to the Association's rights against the Construction Defect Defendants based on its payment to Unit 4904, but for the Association giving general releases to the Construction Defect Defendants of the Association's claims.

Following a hearing, the trial court granted the Association's motion to dismiss, ruling, as a matter of law, that Seneca's breach of contract claim

7

against the Association was premature and that the damages Seneca paid in Unit 4904's Crossclaim did not overlap with the damages sought in the Construction Defect Lawsuit. This appeal timely followed.

**ANALYSIS**

An order granting a motion to dismiss is reviewed de novo. Williams Island Ventures, LLC v. de la Mora, 246 So. 3d 471, 475 (Fla. 3d DCA 2018).

To determine whether the trial court erred in concluding that Seneca's claim for breach of contract failed to state a cause of action, we must answer two questions. First, whether Seneca's breach of contract claim was premature because Seneca was first required to sue the Construction Defect Defendants and suffer a judgment finding that the Association's releases barred Seneca's subrogation rights. Second, whether Seneca's claimed damages, namely those it paid to settle Unit 4904's Crossclaim, overlapped with the damages claimed and recovered by the Association in the Construction Defect Lawsuit. We address each below.

I.    Premature Filing

At the outset we note that the parties do not dispute that where (1) an insurer honored a claim under an insurance policy; (2) the insurer became subrogated to its insured's rights pursuant to the terms of the policy as a result of honoring the claim; and (3) the insured settled with or released the

8

tortfeasor, then the subrogated insurer may have a remedy against the insured under a breach of contract theory. See generally Annotation, Rights and Remedies of Insurer Paying Loss As Against Insured Who Has Released or Settled with Third Person Responsible for Loss, 51 A.L.R.2d 697 (1957) (noting that "the right of a property insurer who has honored a claim under the policy to recover back from the insured the payments made, where the insured has settled with or released a third person allegedly responsible for his loss, are discernible in the cases" including cases that have found "that the action of the insured in settling with or releasing the alleged wrongdoer constitutes a breach of the express contract between the insured and the insurer contained in either the original policy or in some collateral undertaking, such as a subrogation agreement, an assignment, or a loan receipt executed by the insured in connection with the payment of the policy claim"); Allied Mut. Ins. Co. v. Heiken, 675 N.W.2d 820, 826 (Iowa 2004) ("Thus, an insurer who has lost subrogation rights due to the release of the responsible tortfeasor by the insured has a means to seek reimbursement from the insured for its loss based on breach of contract . . . .").

Instead, the issue before us is whether, as the trial court concluded, Seneca was first required to unsuccessfully sue the Construction Defect

9

Defendants as a condition precedent to suing its insured for breach of the policy's transfer of rights provision, which prohibited the insured from impairing the rights transferred to the insurer for recovery of indemnification payments from tortfeasors. Cf. Arch Ins. Co. v. Kubicki Draper, LLP, 318 So. 3d 1249, 1255 (Fla. 2021) ("[S]ubrogation exists to hold premium rates down by allowing the insurers to recover indemnification payments from the tortfeasor who caused the injury.").

Seneca contends its claim was not premature because at the time it filed suit all the elements of a breach of contract claim existed. Specifically, Seneca maintains that (1) the insurance policy was a valid contract that required the Association not to impair Seneca's recovery rights after a loss; (2) the Association breached the insurance policy by entering into settlements with the Construction Defect Defendants and releasing them from any further liability; and (3) Seneca was damaged by this breach because it could no longer pursue claims against the Construction Defect Defendants on the released claims and thus could not recover the amounts it paid on the Association's behalf to settle Unit 4904's Crossclaim. See Grove Isle Ass'n, Inc. v. Grove Isle Assocs., LLLP, 137 So. 3d 1081, 1094–95 (Fla. 3d DCA 2014) ("The elements of a breach of contract action are: (1)

10

a valid contract; (2) a material breach; and (3) damages." (quoting Schiffman v. Schiffman, 47 So. 3d 925, 927 (Fla. 3d DCA 2010))).

The Association, in turn, contends that Seneca's claim failed because it did not, prior to filing suit against the Association, take the "required" step of first unsuccessfully suing the Construction Defect Defendants. The Association argues that absent such a failed attempt, Seneca could not plead that the Association had breached the insurance policy by impairing its recovery rights or that it suffered damages. The Association argues that, since no court had entered a judgment finding that the releases the Association gave to the Construction Defect Defendants barred Seneca's subrogation claims against those Defendants, Seneca could not allege that the Association breached the policy.

In what appears to be a case of first impression, we are reluctant to conclude that, for an insurer to successfully plead a claim against its insured for breach of contract based on the impairment of recovery rights, the insurer must first unsuccessfully sue the parties to whom the insured granted releases. Such a condition precedent to suit is not contained in the insurance policy at issue. Nor has the Association pointed us to any case setting forth such a requirement in this context.

11

The Association invites us to establish a rule based on an analogy to the professional malpractice cases of <u>Blumberg v. USAA Casualty Insurance Company</u>, 790 So. 2d 1061 (Fla. 2001) and <u>Peat, Marwick, Mitchell & Co. v. Lane</u>, 565 So. 2d 1323 (Fla. 1990). It asserts that a broad rule can be fashioned from these cases, namely that "before a plaintiff can file suit, the plaintiff must first receive an adverse determination on the underlying claim." We do not read these professional malpractice cases as supporting such a broad rule. Rather, we read <u>Blumberg</u> and <u>Peat, Marwick</u> as addressing, in the professional malpractice context, the effect of a collateral legal proceeding on the calculation of when the statute of limitations begins to run.

In <u>Blumberg</u>, the Florida Supreme Court evaluated when the date of accrual was for negligence and malpractice causes of action against an insurance agent based on the agent promising coverage that was ultimately unavailable to the insured. 790 So. 2d at 1062-63. The Court concluded the cause of action accrued when the insured incurred damages at the conclusion of a judicial proceeding where it was found that there was no coverage or when the client's right to sue expired. <u>Id.</u> at 1065. The Court further explained that, when a party asserts that collateral legal proceedings will determine the amount, if any, of a plaintiff's damages, that party should seek an abatement of the main action. <u>Id.</u>

12

In Peat, Marwick, the Court was called on to determine when a cause of action accrued for accounting malpractice relating to income tax preparations. 565 So. 2d at 1325. The Court, analogizing the case to one of legal malpractice, held that the cause of action did not accrue until the United States Tax Court made a final determination regarding the IRS's deficiency determination. Id. at 1327.

While each of these cases involved collateral legal proceedings, the Court's focus was not on whether the plaintiff was required to initiate the collateral proceeding to successively plead the elements of the cause of action. Indeed, in each of these cases, the Court's rationale centered on the statute of limitations issue of "when the redressable harm or injury occurred." In both cases, the Court ultimately concluded that the statute of limitations did not begin to run until the resolution of the related or underlying judicial proceeding. Id. at 1325. This is because only then could it be determined that there was actionable error by the professional. Id. at 1325-27; Blumberg, 790 So. 2d at 1065. In neither case did the Court hold, as the Association suggests, that, to successfully plead its case, the plaintiff must first file the collateral legal action.

Our own review of Florida law also did not yield any such "sue and lose first" rule, but we note that on at least two prior occasions this Court did rule

13

on the merits of an insurer's breach of contract claim against its insured without a prior adverse determination of the underlying subrogated claims. See, e.g., Russak v. State Farm Mut. Auto. Ins. Co., 281 So. 2d 541 (Fla. 3d DCA 1973) (appeal of final summary judgment in favor of insurer in action against insured for breach of contract following insurer's voluntary dismissal of subrogation action upon discovering insured settled with tortfeasor and executed a general release); Ortega v. Motors Ins. Corp., 552 So. 2d 1127 (Fla. 3d DCA 1989) (appeal of final summary judgment in favor of insurer on insurer's claim for breach of contract against insured, which was brought as an alternative claim in insurer's subrogation action against tortfeasor after tortfeasor raised affirmative defense that a release executed by insured barred subrogation action). Both cases therefore call into question the Association's contention that "before a plaintiff can file suit, the plaintiff must first receive an adverse determination on the underlying claim."

"Florida case law consistently holds that a cause of action for breach of contract accrues and the limitations period commences at the time of the breach." Grove Isle Ass'n, Inc., 137 So. 3d at 1095 (quoting Clark v. Estate of Elrod, 61 So. 3d 416, 418 (Fla. 2d DCA 2011)). Seneca pled that the Association breached the insurance policy when it entered into settlements with the Construction Defect Defendants and released them from any further

14

liability. Seneca alleged this breach caused it damages because it could no longer recover the amounts it paid on behalf of the Association through subrogation. While the fact that Seneca did not first unsuccessfully sue the Construction Defect Defendants may ultimately result in a proof problem for Seneca, at this stage of the proceedings, it does not defeat Seneca's otherwise well pled breach of contract action. <u>Raney v. Jimmie Diesel Corp.</u>, 362 So. 2d 997, 998 (Fla. 3d DCA 1978) ("[T]he function of a motion to dismiss a complaint is to raise as a question of law the sufficiency of the facts alleged to state a cause of action. A court is not permitted to speculate as to whether a plaintiff will be able to prove the allegations, rather a court is required to accept all well pleaded allegations contained in the complaint as true.").

Accordingly, we conclude Seneca sufficiently pled a cause of action for breach of contract against the Association. Because the Association has failed to identify any authority requiring Seneca to first obtain an adverse determination in an action against the Construction Defect Defendants before bringing the action, we reverse the trial court's ruling that Seneca's breach of contract claim was premature.

## II. Overlapping Damages

The trial court also concluded Seneca failed to state a cause of action for breach of contract because "the damages Seneca paid in [Unit 4904's Crossclaim] did not overlap with damages in the Construction Defect Lawsuit." Indeed, if the damages sought by the Association (and, therefore the settlement proceeds the Association received from the Construction Defect Defendants) in the Construction Defect Lawsuit were different from the damages paid by Seneca to settle Unit 4904's Crossclaim, then, the Association's release of the Construction Defect Defendants would not have impaired Seneca's recovery rights.

In its operative complaint, Seneca alleged that, because of its liability payment on behalf of the Association (to settle Unit 4904's Crossclaim) it was subrogated to the Association's right to recover from the Construction Defect Defendants. Seneca further alleged that the Association's release of the Construction Defect Defendants in the Construction Defect Lawsuit impaired Seneca's ability to recover from these parties, resulting in Seneca suffering damages, i.e. those damages against the Construction Defect Defendants that it would have recovered but for the Association's release of the Construction Defect Defendants.

The Association contends that the facts alleged do not establish that the Association actually impaired Seneca's rights because the facts do not show that Seneca's liability settlement payments overlapped with the damages the Association sought or recovered in the Construction Defect Lawsuit. In other words, the Association argues its Construction Defect Lawsuit alleged damages distinct from those paid by Seneca to settle Unit 4904's Crossclaim.

Again, while Seneca may encounter hurdles to ultimately proving its claim, Seneca adequately alleged that at least a portion of the $1,000,000 it paid to settle Unit 4904's Crossclaim was recovered by the Association as part of the Association's $12,565,000 settlement of the Construction Defect Lawsuit. For purposes of a motion to dismiss, the trial court was, and we are, required to accept this allegation as true. See Town of Miami Lakes v. Miami-Dade Cnty., 337 So. 3d 868, 870–71 (Fla. 3d DCA 2022) ("A motion to dismiss is designed to test the legal sufficiency of the complaint, not to determine factual issues[.] When ruling on a motion to dismiss, a trial court must accept all factual allegations as true." (internal citations omitted)). The trial court erred by concluding, as a matter of law, to the contrary and we reverse on these grounds as well.

17

## CONCLUSION

Regardless of whether Seneca will ultimately be successful in proving that (a) the releases are fatal to its right to recover from the Construction Defect Defendants, and (b) overlap exists between the settlement monies it paid and the damages it would have sought in an action against the Construction Defect Defendants, Seneca has met the burden of pleading these issues. We therefore hold that Seneca sufficiently pled a breach of contract claim against the Association. Seneca pled facts establishing all elements of a breach of contract claim, including damages arising from the Association's alleged breach of the insurance policy, and the Association failed to set forth any legally cognizable basis for why such a claim should be deemed premature.

Reversed.